Filed 10/27/14  In re J.R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B251280 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK92758) |
| Plaintiff and Respondent, | |
| v. | |
| JENNIFER W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Jacqueline Lewis, Juvenile Court Referee.  Affirmed.

Joseph D. Mackenzie, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel.

_____

Jennifer W. (mother) appeals from the April 18, 2013 order sustaining a Welfare and Institutions Code section 342 subsequent petition and placing her daughter, J.R., with father.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Born in October 2000, J.R. became the subject of a bitter custody dispute which generated eight referrals to the Department of Children and Family Services (DCFS) from 2003 through 2010, each of which was concluded as inconclusive or unfounded. Eventually, a family law order gave father full physical custody and mother visitation. In February 2012, father voluntarily enrolled in an out-patient alcohol treatment program.

J.R. came to DCFS's attention again on March 1, 2012, when she was hospitalized upon revealing suicidal ideations to a school nurse. The hospital social worker reported that J.R. said she was afraid to tell father that she wanted to live with mother. The DCFS social worker concluded that the matter should be resolved in the family court. But soon after being released to mother following a 72-hour hold, J.R. was readmitted after she had a panic attack in response to being told that she would be returning to father's care.

J.R. was still hospitalized when she told a social worker she wanted to live with mother so they could talk about "girl stuff." J.R. said father had mood swings, yelled at her for no reason and was often intoxicated. J.R. threatened to kill herself if forced to return to father. Although he believed mother was coaching J.R., father eventually agreed she could live with mother on the condition that he have unmonitored weekend overnight visits. J.R. was returned to mother that same day. DCFS filed a section 300 petition almost two weeks later, on March 28, 2012.

When the social worker met with J.R. at school, J.R. said she did not know why DCFS was involved or why she was detained from father and placed with mother. J.R. stated that father "goes berserk" when he is not drinking, but is nicer when he drinks and

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code.

he drinks regularly. Several years ago, father twice hit J.R. on the back with an open hand; in the last year, he pulled her hair. J.R. enjoyed living with mother and her younger half-sibling, J. J.R. was prescribed medication for her ADHD, but the hospital told her to stop taking it because it might be causing her anxiety and depression. The CSW interview was cut short when J.R. complained of stomach pains and started to cry. In a meeting a few months later, J.R. said she was happy living with mother and had made friends in the neighborhood. She reiterated that father drinks a lot while at home (something which father and paternal grandmother denied). In a later phone interview while J.R. was staying with father, J.R. said she was comfortable staying with father. After mother was arrested for burglary and vandalism in late June 2012, J.R. and J. stayed with father and paternal grandmother.

On August 1, 2012, father pled no contest and mother submitted to the court's jurisdiction on an amended petition which alleged J.R. was a dependent child under section 300, subdivisions (b) and (c) because father had an unresolved history of substance abuse, was a current abuser of alcohol, had been under the influence of alcohol while in J.R.'s presence and had prior drug-related criminal convictions (paragraph b-3), and mother and father emotionally abused J.R. by making her the subject of their contentious custody dispute (paragraph c-1). J.R. was released to mother and a review hearing was set for January 2013.

On September 19, 2012, DCFS received a referral alleging that J.R. and J. were victims of general neglect and that J. may have been sexually abused; DCFS found the allegations unfounded.

J.R.'s therapist met with mother and father on September 26, 2012. After that meeting, mother moved with J.R. and J. to Garden Grove, to live with mother's boyfriend. In October 2013, father complained to DCFS that mother was not allowing his court-ordered visits and had changed J.R.'s school without informing him. DCFS scheduled a Team Decision Meeting for October 10, 2012. The last contact DCFS had with mother was when she called to cancel the meeting. Subsequent attempts to make

3

contact were unsuccessful.  On October 25, 2012, paternal grandmother informed the social worker that a police report had been filed accusing mother and her boyfriend of stealing $38,000 from the boyfriend's brother's checking account.  A missing persons report was filed as to J.R. with the Garden Grove Police Department.  On October 29, 2012, the juvenile court issued a protective custody warrant for J.R. and a no bail warrant for mother.

On December 6, 2012, father informed the juvenile court that he had learned J.R. was with mother in Mexico; father was working with the local police and the Mexican authorities to secure J.R.'s return.

On February 1, 2013, J.R. called paternal grandmother.  J.R. said she was in an internet café in Aguascalientes, Mexico and had run away from mother.  Paternal grandmother relayed the information to the assigned social worker, who did not get the message until two weeks later.  Meanwhile, father made arrangements to have J.R. picked up at the internet café and stay with relatives until he could pick her up at the border.  J.R. arrived at father's home on February 9, 2013.  J.R. was detained from mother on February 14, 2013; according to the detention report, mother's whereabouts were unknown, but she was believed to be in Aguascalientes, Mexico.  When the social worker interviewed J.R. at father's home that day, J.R. recanted everything she had said about father; J.R. said mother had forced her to say those things.  J.R. explained that mother drove J.R., J. and the daughter of a friend to Mexico on an apparent impulse.  Once there, car registration problems prevented their return to California a few days later.  Eventually, they came back into the United States through San Antonio, Texas.  After spending two weeks staying with J.'s father's family, they went to Burbank.  Maternal grandfather picked them up and brought them to Ventura.  Maternal grandfather bought them bus tickets back to Tijuana.  In Tijuana, mother arranged for a ride back to Aguascalientes.  There, J.'s father rented them a little furnished house.  When they moved into a second house, mother stole the furniture from the first house.  They moved several more times, always within the Aguascalientes area.  Mother slept all day and went

4

out at night, leaving J.R. and J. home alone. Mother favored J. and treated J.R. like Cinderella. Mother yelled at J.R., called her names, hit J.R. with her hands and a broom stick and threw things at J.R.. After one particularly bad incident, J.R. ran away. At an internet café, she borrowed money to call paternal grandmother.

On February 20, 2013, DCFS filed a section 342 subsequent petition which alleged that mother physically abused J.R. (paragraphs a-1 and b-1); mother abducted J.R. and secreted her from the juvenile court from October 17, 2012 until February 14, 2013 (paragraph b-2) and prior to 2012, mother left J.R. home alone at night without adult supervision for an extended time (paragraph b-3). An adjudication hearing was set for March 27, 2013.

According to a February 2013 report, mother's last known physical and mailing address was on Vermont Avenue and her secondary address was on La Prada Street. But the report for the hearing on the section 342 petition states that mother's last known address was in Garden Grove (where mother had moved to live with her boyfriend in late September 2012). Notice of the hearing was sent to mother at the Garden Grove address. Finding mother was not noticed at her section "316.1 address," the juvenile court continued the matter to April 18, 2013.[2] The court recited mother's correct address on La Prada Street, including the apartment number.

Notice of the continued hearing was served on mother by mail at the La Prada address, but the proof of service is flawed in two respects: (1) it omits the apartment number of the La Prada address and (2) it misidentifies the section 342 petition as a section 387 petition. Mother was represented by counsel at the April 18th hearing but mother did not appear personally. Mother's counsel did not challenge the adequacy of notice to mother, nor object to the juvenile court's finding that mother had been properly noticed. Counsel stated: "I did speak to my client regarding these allegations, and she's denying all of these allegations." The juvenile court sustained the petition, ordered J.R.

---

**2** Section 316.1 requires a parent to designate a mailing address to be used for notices until the parent notifies the court or agency in writing of a new address.

5

removed from mother and placed with father under continued DCFS supervision. Mother was ordered to have no contact with J.R. Mother and J.R. filed timely notices of appeal. Only mother filed an Opening Brief.

## DISCUSSION

Mother's sole contention on appeal is that she was denied due process because notice of the April 18th hearing was defective. She argues that this was the result of the flaws in the proof of service. We find no reversible error.

We begin with the observation that mother forfeited any challenge to the adequacy of her notice of the April 18th hearing by failing to timely object. (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 747.) In *In re Wilford J.*, the presumed father was given notice of a pretrial resolution conference on April 27th, but the notice did not state the formal name of the hearing or indicate the nature of the proceedings (a settlement conference). The mother and children appeared at the hearing and were represented by counsel; the father did not appear and was not represented by counsel. Although only a PRC had been scheduled, the juvenile court conducted a jurisdictional hearing and sustained the petition. Father appeared and was appointed counsel at the dispositional hearing a few weeks later. Following several continuances, the juvenile court ordered the children placed with their maternal grandmother. The father did not challenge notice of the April 27th hearing at any of the subsequent hearings. The father appealed from the dispositional order on the grounds that he had not received proper notice of the April 27th hearing. The appellate court agreed, but found the issue waived by the father's failure to object to notice at any of the subsequent hearings at which he both appeared and was represented by counsel. (*Id*. at p. 754.) The juvenile court explained: "[W]hen a parent had the opportunity to present [a defective notice] issue to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal. This is precisely because defective notice and the consequences

6

flowing from it may easily be corrected if promptly raised in the juvenile court. [Citation.]" (*Ibid.*)

Here, mother appeared by counsel at the April 18th hearing. Counsel had the opportunity to object to notice, but did not do so and affirmatively denied the allegations in the petition, thereby depriving the juvenile court of the opportunity to correct the mistake. Under *Wilford J.*, this constitutes a forfeiture of the issue.

Even assuming mother had not forfeited the issue, we find no merit in her argument that notice was inadequate because the address, although otherwise correct, omitted the apartment number. The omission of an apartment number is not enough to render notice invalid where the notice is addressed to the person to be served at the proper address. (*Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936-937; see 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 23, p. 447 [proof of service has been deemed adequate where it included the recipient's correct street address but omitted the suite or apartment number]; see also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶ 9:86.6 [same].) Here, notice to mother at the correct address was adequate despite the missing apartment number.

Further, the record does not support the following statement in mother's Opening Brief: "It reasonably appears that Mother did not receive either a copy of the section 342 petition or the social worker's report for the hearing to adjudicate that petition, and there is no evidence to the contrary." We prefer to state it, there is no evidence that mother *did not* receive the notice, as well as the petition and report. The proof of service states that both were attached to the notice. At the hearing, mother's counsel stated that he had discussed the allegations of the section 342 petition with mother. From counsel's statement, and his failure to complain that mother had not received the notice or attached documents referenced in the proof of service, the most reasonable inference is that mother did, in fact, receive the documents. On this record, mother has failed to show that she did not receive the petition and report, and thus she has failed to show any prejudice from the missing apartment number. (*In re Ryan R.* (2004) 122 Cal.App.4th 595

7

[although notice of the mother's appeal rights was not mailed to her § 316.1 address, mother failed to establish prejudice where there was no showing that she did not actually receive the notice].)

We also find no merit in mother's argument that notice was defective because the proof of service incorrectly identified the operative pleading as a section 387 petition, rather than a section 342 petition. A section 342 subsequent petition is filed when new, independent allegations of dependency can be made after the court has initially declared a minor to be a dependent child. A section 387 supplemental petition is filed when the agency seeks to remove a dependent child from his or her prior placement, effectively requesting the court to modify its previous placement order. (See § 387, subd. (a).) Although section 342 and section 387 petitions are used in different circumstances, the juvenile court's obligations are the same: "In addition to making the general findings described in section 356, juvenile courts are also required, by the rules of court, to make specific findings on each of the allegations in an original, subsequent or supplemental petition." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1036.) Mother has not shown how she was prejudiced by the misidentification of the pleading in the proof of service. Particularly since mother received a copy of the actual petition, which, unlike the proof of service, is clearly identified on its face as a section 342 petition.

## DISPOSITION

The order is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.                                              GRIMES, J.

8